AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Paula Pirone<br>a/k/a Paula Chennels<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 5:25-mj-1091-PRL<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  September 2019 - December 2021  in the county of  Marion  in the
Middle  District of  Florida  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to commit any offense against the United States or to defraud the United States |

This criminal complaint is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Darren Pope, FBI
*Printed name and title*

Sworn to before me over the telephone or other reliable electronic means and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: May 12, 2025

_____
*Judge's signature*

City and state: Ocala, Florida

United States Magistrate Judge Philip R. Lammens
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Darren Pope, being first duly sworn, hereby depose and state as follows:

### I. INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with Federal Bureau of Investigation ("FBI"). Since September 2023, I have been assigned to the Orlando Residency Agency, where I have conducted white collar crime investigations. I have received extensive training in criminal investigations, including investigations involving government administered health care programs.

2. This case is being investigated by the FBI and the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG").

3. I am submitting this affidavit in support of a criminal complaint setting forth facts sufficient to establish probable cause to believe that Paula Pirone ("PIRONE" or "Defendant"), also known as Paula Chennels, conspired to defraud the United States and to offer and pay health care kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(2)(B)), all in violation of 18 U.S.C. § 371, and for the issuance of an arrest warrant. The facts set forth in this affidavit were gathered in the course of an investigation conducted by me and other federal agents. The information set forth herein is based upon my personal observations, my training and experience, discussions with other law enforcement agents and officers, documents and records that were collected and reviewed in the course of this investigation, information that was obtained from witnesses, and reports prepared by individuals familiar with the subject of this affidavit. Because this affidavit is provided for the limited purpose of establishing probable cause for an arrest, it does not include every known fact concerning

1

this investigation, but rather sets forth only those facts that I believe are necessary to establish probable cause. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only. All figures, times, and calculations set forth herein are approximate.

## II. THE CHARGED OFFENSE

4. Federal law makes it a crime for two or more persons to conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy. 18 U.S.C. § 371.

5. Federal law also makes it a crime to offer and pay illegal kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering, any good, facility, service or item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare. 42 U.S.C. § 1320a-7b(b)(2)(B) ("Federal Anti-Kickback Statute").

## III. JURISDICTION

6. This Court has jurisdiction to issue the requested arrest warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## IV.   THE MEDICARE PROGRAM

7.   During the relevant time period, the Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries." Medicare was divided into multiple parts with separate coverages: Among other things, Part A covered hospital inpatient care; Part B covered physicians' services, outpatient care, and certain medical equipment; Part C covered Medicare Advantage Plans; and Part D covered prescription drugs.

8.   During the time period of the conspiracy, Medicare Part B covered, among other things, doctors' services, outpatient care, and certain durable medical equipment ("DME"), including orthotic braces, that were reasonable and medically necessary. DME companies, laboratories, medical professionals, and other health care providers that provided services to Medicare beneficiaries were referred to as Medicare "providers."

9.   Throughout the conspiracy, Medicare reimbursed DME companies, laboratories, medical professionals, and other health care providers for items and services rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare electronically, through interstate wires, either directly or through a billing company.

10. Across the relevant time period, physicians, clinics, and other health care providers, including DME companies, all of which provided services to Medicare beneficiaries, were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. Providers were required to agree to comply with all Medicare-related laws and regulations, including the Federal Anti-Kickback Statute.

11. During the conspiracy, a Medicare claim for DME was required to contain certain important information, including: (a) the Medicare beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI").

12. During the relevant time period, Medicare only paid for services or items that were medically necessary and reasonable, and which were actually provided as represented. Medicare provided access to Medicare manuals and service bulletins describing billing procedures, rules, and regulations. Medicare did not pay claims that were procured based on the payment or receipt of kickbacks and bribes.

13. Throughout the conspiracy, Medicare was a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f), and a "health care benefit program" as defined in 18 U.S.C. § 24(b).

## V. DEFENDANT AND RELEVANT ENTITIES AND INDIVIDUALS

14. PAULA PIRONE was a resident of Marion County, Florida, and the listed owner of Medeor Management Solutions LLC ("Medeor") and Choice Medical Equipment LLC ("CME"). PIRONE was the registered agent and a beneficial owner of One U.S. Medical Supply, Inc ("OUSMS").

15. CME was a DME supplier formed under the laws of Florida, with its principal place of business in Marion County, Florida. CME maintained an account at Bank 1 ending in x4915 (the "CME Account").

16. OUSMS was a DME supplier formed under the laws of Florida, with its principal place of business located in Orange County, Florida.

17. Medeor was a medical management and consulting company formed under the laws of Florida, with its principal place of business in Marion County, Florida. Medeor maintained an account at Bank 1 ending in x0857 (the "Medeor Account").

18. Cooperating Witness 1 ("CW1") owned and operated Telemarketing Company 1, which operated call centers that targeted Medicare beneficiaries and used deceptive telemarketing techniques to induce Medicare beneficiaries to accept medically unnecessary orthotic braces.

19. Cooperating Witness 2 ("CW2") owned and operated multiple marketing companies that operated call centers that targeted Medicare beneficiaries and used

5

deceptive telemarketing techniques to induce Medicare beneficiaries to accept medically unnecessary orthotic braces.

20. Individual 3 was the nominal owner and an operator of OUSMS.

## VI. PROBABLE CAUSE TO BELIEVE CRIMES HAVE BEEN COMMITTED

### A. OVERVIEW OF THE CONSPIRACY

21. The investigation has revealed that beginning in or around September 2019, and continuing through in or around December 2021, PIRONE, through CME and Medeor, offered and paid illegal kickbacks and bribes to marketers, including CW1 and CW2, in exchange for signed doctors' orders authorizing DME for Medicare beneficiaries. Based on these signed doctors' orders, CME and OUSMS submitted approximately $5,698,942 in false and fraudulent claims for reimbursement to Medicare, of which approximately $1,973,052 was paid.

### B. EVIDENCE SUPPORTING PROBABLE CAUSE

22. Probable cause that PIRONE committed the subject offense is based primarily on statements from CW1 and CW2, who have both pled guilty to federal crimes and are cooperating in the hopes of receiving a recommendation for a sentence reduction, statements from Individual 3, e-mails, contracts, bank records, and Medicare billing data.

#### i. Statements by Cooperating Witness 1

23. CW1 signed a plea agreement filed on or about July 2, 2024, pleading guilty to an information filed in the District of New Jersey charging conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. Pursuant to the plea agreement, CW1 is facing a statutory maximum sentence of ten years' imprisonment. As part of CW1's plea

agreement, CW1 is obligated to provide truthful cooperation to the government. CW1 is cooperating in the hopes of receiving a recommendation from the government for a lesser sentence.

24. CW1 was interviewed by law enforcement on April 17, 2025 and stated that he/she ran a call center that would generate potential leads, consisting of Medicare beneficiary information, that were then sent to a telemedicine company to obtain a doctor's order prescribing orthotic braces. The doctors' order was then sent to PIRONE for use by her DME companies.

25. Agents obtained a marketing agreement between Telemarketing Company 1 and CME, which was signed by PIRONE on behalf of CME. The agreement purports to require CME to pay Telemarketing Company 1 a flat weekly fee for call center services. However, according to CW1, the contract was a sham that masked the true financial arrangement between PIRONE and CW1. According to CW1, PIRONE was purchasing signed doctors' orders at a per-brace price. For example, according to CW1, PIRONE agreed to pay $350 per back brace order and $225 per knee brace order that could be billed to Medicare. CW1 stated that PIRONE told CW1 that she preferred to buy only back and knee brace referrals because Medicare reimbursed those at higher rates.

### a. Statements by Cooperating Witness 2

26. CW2 signed a plea agreement, filed on or about March 21, 2024, pleading guilty to an Information filed in the Southern District of Florida charging conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. Pursuant to the plea agreement, CW2 is facing a statutory maximum sentence of ten years' imprisonment. As part of CW2's

7

plea agreement, CW2 is obligated to provide truthful cooperation to the government. CW2 is cooperating in the hopes of receiving a recommendation from the government for a lesser sentence.

27. CW2 was interviewed by law enforcement on November 2, 2022 and December 18, 2024 and stated that he/she provided PIRONE and her affiliated DME companies patient referrals, including signed doctors' orders, and that PIRONE expected at least two braces to be included in every order. CW2 stated that PIRONE advised that she was purchasing leads for multiple DME businesses that PIRONE and others owned. CW2 advised that he or she sent patient referrals in bulk to PIRONE and that PIRONE decided which lead would go to which company. CW2 said the referrals would contain a patient's name, Medicare number, and doctor's order for DME. PIRONE, through CME, and the affiliated DME companies would pay CW2's company for the leads.

28. CW2 stated that PIRONE worked closely with an employee, who managed the DME businesses alongside PIRONE. CW2 said that PIRONE told CW2 that PIRONE placed other people in charge of the DME businesses she was affiliated with to stay below the radar. CW2 also stated that PIRONE expressed a desire to avoid detection by keeping billings lower and using multiple companies to bill.

29. CW2 also stated that PIRONE would only pay for "good" doctors' orders and never "bad" doctors' orders; "good" meaning those that were reimbursed by Medicare. "Bad" doctors' orders would be replaced with new doctors' orders that could be billed to Medicare.

### b. Statements by Individual 3

30. Individual 3 was interviewed by law enforcement on March 22, 2022. Individual 3 stated that he/she operated OUSMS, a DME company that PIRONE helped set up. Individual 3 paid PIRONE a portion of OUSMS's Medicare reimbursements. Individual 3 stated that PIRONE and another associate of PIRONE's showed Individual 3 how the leads were used to create doctors' orders for DME and how to forward the completed patient referral (including doctors' order) to a billing company to be billed to Medicare.

### ii. E-mail Communications

31. E-mails obtained by law enforcement from cooperating witnesses and through a search warrant corroborate the statements of CW2 and show PIRONE's participation in the conspiracy to defraud the United States and to offer and pay illegal kickbacks in exchange for doctors' orders for DME.

32. For example, on or about August 27, 2020, an individual who worked for PIRONE e-mailed CW2, copying PIRONE, and complained about having to pay upfront for "leads" (which, as CW2 explained, included doctors' orders for DME). The employee complained that the time it took to receive the leads had increased, while the "quality" of the leads—which in my training and experience refers to whether the referrals can be billed to Medicare—had decreased. The employee wrote,

> As you know, our original agreement was to pay at the end of each week, once we had a chance to check the leads, to minimize returns and s/s, reduce losses and maintain a good rating with Medicare. However, at your request, we agreed to change this arrangement so that you could get paid upfront. We did this for weeks without failure, but the time between

9

the payment and the actual drop kept increasing while the quality of the leads kept decreasing. At this time, we have been waiting for two and a half weeks for our own leads to be dropped, and now 10 days for Dr. [*****].Our drops are 90% singles, and we have to continue to reach out again and again to finally have what we paid for.

33.   On or about November 5, 2020, PIRONE e-mailed CW2 and others, stating, "We started with just two DME's [sic] one mine and one of [NAME REDACTED's]. [NAME REDACTED] and I have a very small triage group that works on the doctor chase/telehealth model. It seems to be working and seems very reasonably priced. [A new telemarketer] contacted me about potentially working with us in the future . . . ."

34.   On or about July 30, 2021, PIRONE emailed CW2, stating, "I request your return of the $15,000 Choice Medical [CME] gave you to begin our contract for your marketing efforts with nothing received. I will not be attempting to collect any money previously owed for marketing received that was not processable, it is simply too vast a volume for my team to have to recreate. [NAME REDACTED] has asked me to help them recoup a $10,000 payment they also made to you in March 2021 to begin their marketing contract and received no marketing that they were able to process. Please remit these reimbursements immediately to avoid any necessary collection efforts." In my training and experience, because PIRONE links "marketing" to claims "able to process," and although PIRONE attempts to disguise the true nature of the arrangement, she rather evidences that the arrangement is, in fact, kickbacks being paid for payable claims.

C.   **Bank Records**

35.   Bank records show that, between September 2019 and June 2021, Medicare paid CME, through the CME Account, approximately $1,635,005, and that, between July

2020 and April 2021, Medicare paid OUSMS approximately $338,047.

36. Bank records also show that OUSMS paid PIRONE, through the Medeor Account, approximately $57,015.

37. The bank records also show that PIRONE, through the CME Account and the Medeor Account, paid marketers approximately $429,650. These payments included:

   a. A July 2, 2020, wire transfer from the CME Account to Company 2 in the approximate amount of $11,000; and

   b. A September 18, 2020, wire transfer from the Medeor Account to Company 2 in the approximate amount of $5,850.

### D. Billing Data

38. Law enforcement obtained billing data from Medicare, which reflects total amounts billed to Medicare and paid by Medicare on claims submitted by CME and OUSMS. In total, from in or around September 2019 through in or around June 2021, CME billed Medicare approximately $4,958,491 and was paid approximately $1,635,005 for DME. From in or around July 2020 through in or around April 2021, OUSMS billed Medicare approximately $740,451 and was paid approximately $338,047.

## VII. CONCLUSION

39. Based upon the foregoing, I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, from in or around September 2019, and continuing through in or around December 2021, in Marion County, in the Middle District of Florida, and elsewhere, Defendant Paula PIRONE, together with others, conspired to defraud the United States and to offer and pay illegal health care kickbacks, in violation of

Title 18, United States Code, Section 371.

40. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Special Agent Darren Pope
Federal Bureau of Investigation

Affidavit submitted by e-mail and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3), before me this ___12th___ day of May 2025.

_____
DUTY JUDGE PHILIP R. LAMMENS
UNITED STATES MAGISTRATE JUDGE